Mark E. Turner and Emily Turner v. Commissioner.
Turner v. Commissioner
Docket No. 31066.
United States Tax Court
1952 Tax Ct. Memo LEXIS 180; 11 T.C.M. (CCH) 604; T.C.M. (RIA) 52184; June 17, 1952
*180 Statute of limitations: False or fraudulent return. - Omission from 1943 income tax return of substantial receipts from sales of potatoes, most of which were grown by the petitioners, held not the result of intent to evade tax where the petitioners kept records to the best of their ability, which records were turned over to their tax advisor upon whom they had relied for a number of years in the preparation of their returns. The 1943 return having been timely filed and there being no fraud, the statute of limitations barred assessment when the notice of deficiency was mailed in 1950. Kenneth W. Bergen, Esq., 84 State St., Boston, Mass., and Paul P. Lipton, Esq., for the petitioners. Joseph Landis, Esq., for the respondent. ARUNDELL *181 Memorandum Findings of Fact and Opinion The respondent determined a deficiency in income tax for the calendar year 1943 in the amount of $29,709.94 to which he has added a 50 per cent penalty in the amount of $14,854.97. The greater portion of the deficiency arises from the determination that the petitioners understated their income from the sales of potatoes by $34,030.24. Other adjustments made by the respondent were the inclusion of salary in the amount of $4,565, increase of rental income by $3,125, and disallowance of expenses to the extent of $1,387.30. The respondent relies only on the adjustment of potato sales to establish fraud in the 1943 return. Findings of Fact The petitioners are husband and wife and reside at Presque Isle, Maine. Their income tax return for the year 1943 was filed with the Collector of Internal Revenue for the District of Maine on March 14, 1944. The return purported to be a joint return, but was signed only by the husband, Mark E. Turner. The petitioners are farmers. Their principal source of income is the sale of potatoes that they raise on their farms. Additional income was realized from the sale of potatoes purchased from others, from *182 salaries received by the petitioner Mark, from the rental of apartments, and from the sale of poultry and dairy products. The petitioners, sometimes herein called Mark and Emily, were married in 1917. They lived on farms from the time of their marriage until 1949. Beginning in 1934, they lived in Presque Isle during the winter months. It was their practice to go to the farm about April of each year where they remained until the end of the potato digging season in the fall. In 1939, they built an apartment house in Presque Isle containing seven apartments, one of which they thereafter occupied during the winter. Mail addressed to them was delivered to their apartment the year round. The petitioners raised most of their food on the farm on which they lived and in their garden. The things that they found it necessary to buy were paid for out of proceeds of sales by Emily of eggs, poultry, and dairy products. Beginning with 1936, Emily kept a record of the petitioners' sales of potatoes. The record consisted of pencilled entries in a booklet prepared by a farm bureau and furnished by it to potato growers. The booklet was designed to provide a complete record of production and sales *183 of potatoes, including numbers of barrels sold, grade, variety, price, name of purchaser, loading point, and car number. In making entries in the pamphlets, Emily did not make use of the column headings. She entered in consecutive columns the date, car number, number of barrels, variety, and selling price. Emily had never had any bookkeeping training, and no one ever gave her instructions as to how to make entries in the pamphlet, which the parties call the "potato book". Mark could read only with extreme difficulty. The usual procedure was that when Mark loaded potatoes in a railroad car for shipment, he gave Emily the car number, which she entered in the potato book, with the date, at the first opportunity. The book was kept in town, and Emily did not get to town more than once or twice a week. In most instances, the purchasers of potatoes furnished a settlement sheet covering each shipment which showed details as to dates, quantities, varieties, freight and other costs, and net proceeds. Such settlement sheets were accompanied by the purchasers' checks for any balance due to Mark. The settlement sheets and checks were received by Mark who detached the checks, and left the settlement *184 sheets in the apartment for Emily's use in completing her entries in the potato book. Some checks were cashed by Mark, some deposited in his bank account, and some were applied to his indebtedness to the bank. At times, Mark contracted to sell potatoes in advance and received deposits on such contracts. Such deposits were not entered in the potato book at the time of receipt. No record was made of such sales until settlement sheets were received. Mark sometimes sold potatoes to persons who did not give settlement sheets, but gave Mark only a check. On such sales, Emily entered the amounts of the checks which Mark advised her he had received. In some of such sales, the buyers, at Mark's direction, issued checks directly to the persons from whom Mark purchased the potatoes. Emily had considerable difficulty in understanding and interpreting some of the settlement sheets, particularly where there were offsets for various items as, for instance, frost damage claims by the purchasers. The petitioners' potato crop was good in the year 1943. Help was difficult to obtain, and a heavy rain during the digging season caused the digging crew to leave for a while. Emily helped with the digging *185 that fall, and also kept the records of the pickers' names, time worked, and bushels dug. Mark and Emily dug potatoes in 1943 until November 16th, which was later than was customary, and the crop of 25,040 barrels dug in that year was above the average theretofore produced. During the fall and winter of 1943, Emily assisted Mark in the operation of a bowling alley in Presque Isle. She worked in the bowling alley from 7 to 12 at night and on Sundays. Her working there was due to the fact that at that time they had no manager of the alleys. In 1943, two of the petitioners' apartments in Presque Isle were set aside for the use of, and rented to, persons in the military service. There was a frequent turn-over of these apartments, and the preparation of them for new tenants required a considerable amount of Emily's time. Because of the unusual demands upon Emily's time in the fall of 1943, for reasons above stated, Emily failed to enter in the potato book the proceeds of sales shown by the settlement sheets that were received late in 1943. Those settlement sheets that were received prior to December 10, 1943, were kept together, folded, and on the outside sheet Emily made a pencilled *186 notation reading "In 1943 Income Tax". The sales recorded on those sheets amounted to $9,099.54. Net sales covered by settlement sheets received in 1943 after December 10th amounted to $5,172.97. Of the total sales proceeds shown on the two packages of sales slips, the sum of $9,956.59 was omitted from the petitioners' 1943 income tax return. The settlement sheets so accumulated by Emily were turned over to the man who prepared the petitioners' 1943 income tax return. Farm operating expenses were paid partly by check and partly in cash. Emily made out the expense checks which were signed by Mark. She kept a so-called potato-picking book in which was recorded the quantity of potatoes picked by each picker. The pickers were usually paid in cash. Neither Mark nor Emily knew anything about preparing income tax returns, and neither of them ever filled out a return. Their returns for a number of years, including the year 1943, were prepared by a former deputy collector by the name of Howe, who died in 1946 at the age of 77. When Howe called at the Turners' apartment to prepare their 1943 return, Emily gave him the potato book, the settlement sheets and accompanying vouchers, and their *187 checkbook. Howe did not make use of bank statements or deposit slips in preparing the return. The figures contained in the petitioners' 1943 return included some overstated items of income. Among these were a duplication of cars in the potato book, advance payments received in 1942 but included in 1943 income, proceeds of two cars included in the 1943 potato book but not included by the respondent in income, and miscellaneous adjustments in the amount of $620.66. The potato book kept by Emily reflected potato sales in 1943 in the aggregate amount of $105,157.42. The respondent determined that checks received by Mark in the aggregate amount of $102,339.55 represented gross income from sales of potatoes. Of the total represented by such checks, the sum of $93,946.54 represented gross receipts from potato sales, and $86,008.08 represented gross income. The petitioners reported $69,232.04 as gross income from such sales. The understatement of gross income from potato sales was in the amount of $16,776.04. The return filed by the petitioners for the year 1943 was not false or fraudulent with intent to evade tax. The income tax return of the petitioners for the year 1943 was filed *188 on March 14, 1944. No waiver extending the time for assessment of income tax for the year 1943 has been requested of the petitioners, and they have not executed any waiver. The notice of deficiency in these proceedings was mailed on July 26, 1950. Assessment and collection of the amount determined by the respondent as a deficiency for the year 1943 are barred by operation of the statute of limitations. Opinion ARUNDELL, Judge: The income tax return of the petitioners for 1943 was timely filed in 1944. The petitioners were not asked to, and did not, file a waiver of the statute of limitations. Consequently, the basic three-year period of assessment expired on March 15, 1947. Internal Revenue Code section 275 (a) and (f). The notice of deficiency was mailed by the respondent on July 26, 1950. To lift the bar of the statute of limitations, the respondent relies on the provisions of Code section 276 (a) which permits assessment at any time in the case of a false or fraudulent return with intent to evade tax. The return filed by the petitioners in these proceedings was undoubtedly false in that it was incorrect and omitted a substantial amount of income. *189 Woods v. Lewellyn, 252 Fed. 106. But falsity in itself is not enough under the present statute to lift the bar of the statute of limitations. The return must be false or fraudulent with intent to evade tax. Here we cannot find in the record an intent to evade tax, the establishment of which rests on the respondent. Failure to report the full amount of income rests upon several factors: (1) inability of the petitioners to keep complete and adequate records; (2) lack of familiarity with the income tax law and inability to prepare an income tax return because of lack of education or experience; (3) reliance upon the person whom they engaged to prepare their return who, from the description given, should have been able to prepare a correct return. The petitioners cannot be charged with any willful failure to keep records. The evidence is clear that Emily attempted to keep a record of potato sales to the best of her ability. It is also clear that she had no training for that kind of work, and that due to the unusual pressure of work in 1943 she fell behind in making entries in the so-called potato book. Her lack of training worked both ways; some entries that should have been *190 made in 1942 were carried into the 1943 record and worked to the disadvantage of the petitioners, whereas failure to record some 1943 sales deprived the Government of some revenue for that year. Resort is sometimes had to the old maxim that ignorance of the law is no excuse. But modern tribunals also recognize, as said in Davis v. Commissioner, 184 Fed. (2d) 86, that: "It is a matter of common knowledge that very few people are familiar with the income tax laws and regulations. Most of them resort to expert advice in the preparation of their returns." Perhaps the person employed by the petitioners to prepare their return was not the expert in tax matters that they thought him to be. There is some indication in the record that he did not use the degree of care in compiling figures that is to be expected of a person who holds himself out as skilled in a business or profession. Nevertheless, he had prepared the petitioners' returns since 1936 and they had come to rely on him and did so rely on him in the preparation of their 1943 return. Such reliance gives rise to no imputation of fraud and certainly does not affirmatively establish the existence of fraud. Griffiths v. Commissioner, 50 Fed. (2d) 782. *191 "Fraud implies bad faith, intentional wrongdoing and a sinister motive." Davis v. Commissioner, supra.Upon examination of the whole record, we cannot find that these elements prompted the omission of income from the petitioners' return for the year 1943. Assessment and collection of any deficiency in income tax for the year 1943 are barred by operation of the statute of limitations.